**In the United States District Court
for the District of Kansas**

───────────

Case No. 24-cr-40017-TC

───────────

United States of America,

*Plaintiff*

v.

Tevin D. Nance,

*Defendant*

───────────

**MEMORANDUM AND ORDER**

Tevin Nance was indicted on one count of possession of a firearm by a prohibited person under 18 U.S.C. § 922(g)(1). Doc. 1. His firearm was discovered in a frisk following the lawful stop of a vehicle in which he was the passenger. Doc. 14 at 1. The frisk violated the Fourth Amendment because officers lacked a reason to think Nance was armed and dangerous. As a result, Nance's motion to suppress is granted.

**I**

**A**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Traffic stops are "Fourth Amendment seizures of limited scope and duration." *See United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007). They comply with the Fourth Amendment when they are supported by "reasonable, articulable suspicion that criminality is afoot." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968) and *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "Reasonable suspicion" requires a court to "consider the totality of the circumstances—the whole picture."

1

*United States v. Daniels*, 101 F.4th 770, 776 (10th Cir. 2024) (citation and internal quotation marks omitted). When officers seek only to confirm or dispel their reasonable suspicion, they stay within the scope of an ordinary *Terry* stop. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Frisks require more facts than those that justify a mere stop. "[T]o proceed from a stop to a frisk," an officer "must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). To that end, an officer must "point to particular facts from which [he or she] reasonably inferred that [an] individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968). If an officer can do so, then he or she may "conduct a patdown search to determine whether [an individual] is in fact carrying a weapon." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citation and internal quotation marks omitted).

## B

Officers Morgan Swisher and Ashlee Schulz stopped a car for failing to signal a turn around 3:00 PM on a sunny November day in a Topeka, Kansas neighborhood. Doc. 14 at 1–2.[1] Two men were inside the car: Wallace Butts in the driver's seat and Tevin Nance in the passenger's seat.[2] *Id.*; Doc. 17 at 2. Both men provided identifying information to Swisher. Doc. 14 at 1–2. Later, "[a]t or about eight minutes into the stop," Swisher opened the driver's door and ordered the driver out, "telling him that he ha[d] a misdemeanor arrest warrant." *Id.* By this point, a third officer had arrived. Doc. 1 at 2. With his assistance, the driver was handcuffed and searched. Doc. 14 at 1–2.

After Butts was arrested, Swisher expressed to one of the other two officers that she was going to have Nance step out of the car for a search. Doc. 14 at 2–3. She said this was "because" she could smell marijuana. After Nance exited the car, Swisher told him that she could

---

[1] All document citations are to the document and page number assigned in the CM/ECF system. Facts are drawn from the parties' briefs, testimony at the June 13 suppression hearing, and bodycam recordings of the stop.

[2] In evaluating a motion to suppress, a "district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). Neither side receives deference.

"smell the odor of marijuana so I'm gonna[…]" and began to frisk him. The frisk revealed that Nance had a handgun in the waist of his pants on his left hip. *Id.* Swisher removed it and handcuffed Nance. He then stated, after being asked, that he did not have any other weapons. Swisher responded "well, based upon me smelling the odor of marijuana, I am going to search you [i.e., Nance]." Nance was searched—rather than frisked, this time—and then "placed in a patrol car." *Id.* Swisher returned to the stopped vehicle, searched it, and mentioned that there was "[a] pretty strong weed [smell coming] from right in the middle." *See id.* She then "discovered two small pieces of marijuana inside a cigarette pack in the console." *Id.*

Swisher drafted a Kansas Standard Arrest Report. It reads in relevant part:

> As [Nance] exited the vehicle, I reported to him I was going to pat him down for weapons based upon his behavior, and for officer safety purposes ([Nance] had displayed multiple indicators of pre-attack indicators, as his hands were actively shaking, he would not make eye contact with officer's, he was blading his body away from officer's, and he would not directly answer officer's questions, and instead would mumble and turn away). When I went to pat [Nance's] waistline down, I immediately felt a gun within his pants on his hip.

Doc. 14 at 4; Doc. 17 at 4. The parties' dispute turns in part on whether this report is consistent with Swisher's statements during the stop.

Nance had been convicted of one or more felonies in Kansas state court, so he was indicted in federal court under Section 922(g)(1). Doc. 1. He moved to suppress the firearm discovered during Swisher's frisk. Doc. 14. The Government responded, Doc. 17, and Nance replied, Doc. 18, at which point the Government provided some additional authorities, Doc. 19. A hearing on Nance's motion was held June 13, 2024. At the hearing, the Government played bodycam footage from Swisher and Schulz.

## II

Nance's motion to suppress is granted. He was frisked without reasonable suspicion that he was armed and dangerous, in violation of the Fourth Amendment, and no exception to the exclusionary rule applies.

**A**

Nance concedes that the stop was justified at its inception, Doc. 14; Doc. 17 at 8–11, and does not argue that it was extended unreasonably, *cf. Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015). He only challenges the frisk that followed the stop. Doc. 14 at 5–6. Thus, the primary issue is whether Swisher had reason to think that Nance was armed and dangerous.³ *United States v. Samilton*, 56 F.4th 820, 828 (10th Cir. 2022). Despite her post-frisk statements to the contrary, she did not.

To justify a frisk, an officer must "point to particular facts" which indicate "that [an] individual was armed and dangerous."⁴ *Sibron*, 392 U.S. at 64. Inferring as much about Nance was not reasonable—that inference depends on construing typical and non-threatening behaviors as inherently suspicious. For example, Swisher wrote in her report that Nance displayed evasive body language by turning his body away

---

³ The parties dispute whether "armed" and "dangerous" are independent requirements. *See* Doc. 14 at 8–9. The Tenth Circuit has weighed in several times. *Compare United States v. House*, 463 F. App'x 783, 788 (10th Cir. 2012) (considering "each requirement [i.e., "armed" and "dangerous"] to determine if [a] frisk … was lawful") *with United States v. Hughart*, 645 F. App'x 678, 684 (10th Cir. 2016) (distinguishing *House* and explaining that "each element cannot be viewed in isolation"). When it has done so precedentially, it has treated "armed" and "dangerous" as conjunctive. *United States v. Gurule*, 935 F.3d 878, 886 n.3 (10th Cir. 2019), *as revised* (Oct. 10, 2019). Accordingly, "armed and dangerous" is treated as a single requirement when resolving Nance's motion. *Id.*

⁴ The Government confirmed at oral argument that it does not argue for a bright line rule under which probable cause to search a vehicle would also license a frisk or search of individuals found within that vehicle during the search. *Cf. Riley v. California*, 573 U.S. 373, 385 (2014) (noting that, under *Arizona v. Gant*, "a warrantless search of a vehicle's passenger compartment" is permitted "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle") (citation and internal quotation marks omitted); *Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (concluding that an officer had probable cause to believe that each of three men "in a relatively small automobile" possessed a controlled substance). Nor does it argue that the officers had probable cause to search Nance for possession of drugs despite Swisher's stated desire to search the vehicle. The only argument being offered is that Swisher had reasonable suspicion to frisk Nance for a weapon because she believed he was armed and dangerous.

from her during the traffic stop. Doc. 14 at 4 (referring to this behavior as "blading"); *see United States v. Briggs*, 720 F.3d 1281, 1286 (10th Cir. 2013). The video belied this description. But in any event, evasive and erratic movements are "not of ironclad significance." *Id.* (citation and internal quotation marks omitted). The movements alleged in this case are particularly ambiguous, since "[t]he [G]overnment concurs [Nance] did not 'blade' his body when exiting the vehicle." Doc. 17 at 5. To be sure, Nance shifted around in his seat during the course of the stop. But the traffic stop lasted for more than ten minutes. Without more—like "sinking down in an apparent effort to avoid detection"—the type of behavior that Nance displayed is innocuous. *See United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992). To conclude otherwise would render suspicious his mere presence in the vehicle. *Cf. United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000) (noting that some facts are "so innocent or susceptible to varying interpretations as to be innocuous"); *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.").

Swisher also claimed Nance was slow to answer, avoided eye contact, and mumbled when he was asked whether he had a gun. *See* Doc. 14 at 2, 4; Doc. 17 at 3, 5. Mumbling might contribute to reasonable suspicion in some circumstances. *See Terry*, 392 U.S. at 7. But lack of eye contact is less useful because it is "clearly susceptible to unsuspicious interpretations," *Barbee*, 968 F.2d at 1029, as is answering slowly, *cf. Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) (noting "*unusually* slow and deliberate speech" in context with other evidence of alcohol consumption) (emphasis added). Even assuming these behaviors could be construed to give rise to a suspicion that Nance was under the influence of drugs or alcohol (something the Government did not argue), that would not itself suggest that Nance was armed and dangerous. *See Michigan v. Long*, 463 U.S. 1032, 1036 (1983) (upholding the frisk of a driver who "appeared to be under the influence of something" when he "was not frisked until the officers observed … a large hunting knife on the floorboard of the driver's side of the car"); *United States v. Romero*, 935 F.3d 1124, 1134 (10th Cir. 2019) (Tymkovich, C.J., concurring in part and dissenting in part) (construing *Long* this way).

Nance's allegedly shaking hands and other alleged signs of nervousness add very little to the above. Reasonable suspicion based on nervousness usually arises at the extremes—when nervous behavior is

5

"unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion." *See United States v. Kitchell*, 653 F.3d 1206, 1220 (10th Cir. 2011); *Garcia*, 751 F.3d at 1146 n.11 (noting "a tension between deferring to an officer's ability to detect suspicious behavior and discounting nervous behavior because everyone gets nervous when stopped by a police officer") (citations and internal quotation marks omitted). Neither party claims that Nance was extremely nervous, nor did Swisher testify that Nance was extremely nervous. Indeed, the video of the stop fails to capture any of the nervousness that Swisher claims to have seen or that would lead a reasonable officer to believe Nance was armed and dangerous.

The Government also notes that Nance was riding with a driver who had an active misdemeanor warrant. Doc. 17 at 3; *see* Doc. 14 at 2. It argues that fact permits Swisher to "infer a common purpose" between Butts and Nance, and thus believe that Nance knew of Butts's misdemeanor arrest warrant. *United States v. Fager*, 811 F.3d 381, 386 (10th Cir. 2016) (quoting *United States v. Dennison*, 410 F.3d 1203, 1213 (10th Cir. 2005)). But when Nance was frisked, Butts had already been arrested and there was no evidence presented as to what crime gave rise to his misdemeanor warrant. Put simply, there is nothing about Butts's misdemeanor warrant that would have made Nance seem armed and dangerous. *See Dennison*, 410 F.3d at 1213 (noting passenger's incentive "to conceal evidence of any wrongdoing"). After all, criminal history must operate "in conjunction with other factors." *See Gurule*, 935 F.3d at 886 n. 4; *see also United States v. Torres*, 987 F.3d 893, 904 (10th Cir. 2021). Those other factors are weak in this case, and little about the driver's misdemeanor warrant or the circumstances of the stop suggests a risk of danger to any of the three officers on the scene. *Cf. Gurule*, 935 F.3d at 887 (outstanding warrant for theft with "a great deal of property" in the backseat); *Dennison*, 410 F.3d at 1212 (four arrest warrants plus "admitted involvement with a 'domestic' dispute" earlier that evening). So the driver's misdemeanor warrant, like the other alleged signs of danger, contributes marginally to the reasonable suspicion analysis.

All these facts—evasiveness, nervousness, and the driver's misdemeanor arrest warrant—were not enough for a frisk. To frisk Nance for weapons, Swisher needed to "reasonably suspect[] that [he] might be carrying one." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007). Such suspicion was not warranted in Nance's case. He was nervous, but nervousness is an ordinary part of traffic stops. *See Delaware v.*

*Prouse*, 440 U.S. 648, 657 (1979). He did not always make eye contact, but that fact is "clearly susceptible to unsuspicious interpretations." *Barbee*, 968 F.2d at 1029. He shifted around in his seat, but the traffic stop lasted for more than ten minutes. Putting these factors together does not create reasonable suspicion that Nance was armed and dangerous.

It is undoubtedly true that police work is a dangerous endeavor. In evaluating an officer's conduct, a court cannot be guided by the 20/20 hindsight deployed from the peace of a judge's chambers. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). And a judge should not "pigeonhole each purported fact" as innocent or suspicious, but must instead give "deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997). Yet the circumstances, particularly as shown on the video of the stop, were not suspicious. They reflected at most ordinary nervousness, even in light of the driver's misdemeanor warrant. *See, e.g.*, *United States v. Wood*, 106 F.3d 942, 944, 948 (10th Cir. 1997) (rapid breathing, trembling hands, and throat clearing were merely "generic … nervousness"). So Swisher had at most a hunch that Nance was armed—one that turned out to be correct, certainly, but not one that justified her search. *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) ("[R]easonable suspicion cannot be based upon a mere hunch.") (internal quotation marks omitted).[5]

Swisher testified to, and the Government raised, several other facts that attempt to clear the reasonable suspicion hurdle. But none of those facts gave Swisher reason to think that Nance was armed and dangerous.

First, the Government argues that Swisher smelled marijuana and that "[a]n individual's involvement with drug transactions or distributions can support reasonable suspicion to frisk that individual for weapons." Doc. 17 at 14 (citing *United States v. Garcia*, 459 F.3d 1059,

---

[5] Of course, the Government likely could have searched the vehicle based upon the smell of—as clarified at the suppression hearing—raw marijuana. *United States v. Phillips*, 71 F.4th 817, 823–24 (10th Cir. 2023). But, as noted above, it does not argue that this conclusion could support a search of Nance. It contends the frisk was appropriate only because Swisher had reasonable suspicion to believe that Nance was armed and dangerous.

7

1064–65 (10th Cir. 2006)). But Swisher never indicated—in her post-arrest report or while testifying at the suppression hearing—that she thought anyone in the vehicle, Nance included, was buying or selling drugs. *Cf. Garcia*, 459 F.3d at 1064–66 (officer observed activity consistent with narcotics transactions); *Torres*, 987 F.3d at 904–05 (officers knew that the defendant "had just driven [his] passenger to a place where she had tried to buy heroin"). In fact, there was no indication that any of the three officers knew of either of the vehicle's occupants before they were stopped or saw anything after the stop that would have led them to believe that there were ongoing drug transactions.

Second, the Government points to actions the officers took at the scene that "lend credibility to the officer's belief that their safety was in jeopardy," such as "the presence of a third officer" and the officers' "use of the [car's] 'B' [p]illar" to shield themselves. Doc. 17 at 22. Neither of these things move the reasonable suspicion needle. Reasonable suspicion arises from facts suggesting that an individual is armed and dangerous. *See United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (recalling that officers must have "*articulable* and reasonable suspicion that the person is armed and dangerous") (emphasis added). That principle is reversed in the Government's argument: look at the officers' behavior, backfill reasons for that behavior, then infer that the officers must have had unarticulated reasons to suspect that Nance was dangerous. This does not work. The Tenth Circuit has "long since rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the *Terry* analysis." *United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012) (citation omitted). The principle that subjective views are irrelevant is most often invoked when defendants argue that officers had subjectively unreasonable motivations for a stop or frisk. *See, e.g.*, *id.* But it applies with equal force in this context where the Government is essentially arguing the officers' subjective motivations justified their conduct. *See United States v. Pena-Montes*, 589 F.3d 1048, 1052 (10th Cir. 2009) (requiring a "particularized and objective basis" for suspicion, noting that "[a] mere hunch or conjecture will not suffice," and explaining that "the detaining officer's subjective motivations are irrelevant to [the *Terry*] inquiry"); *United States v. Karam*, 496 F.3d 1157, 1163 (10th Cir. 2007) (finding that an officer's

"suspicion was wholly subjective and thus irrelevant to the reasonable suspicion calculus").[6]

Third, Swisher explained at the suppression hearing that Nance raised his arms *unusually* high above his head when asked to exit the vehicle. For one thing, she had already concluded that she was going to frisk Nance by this time. As a result, this behavior could not have been considered as part of the reasonable suspicion analysis. For another, this is intuitively safe behavior that dispels any officer concerns that Nance may have been reaching for a weapon in either his pockets or waistband. *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 767 (10th Cir. 2021) (concluding that "the quantum of reasonable belief" that a suspect was armed "significantly increased" when he "raised his hands from his sides, appeared to place one or both of [them] in the front of his pants' waistband, and continued to refuse to comply with the officers' commands"). Nance's decision to exit the vehicle with his hands raised would not make a reasonable officer suspect that he was armed and dangerous. *Cf. id.* To the contrary, Nance's conduct as shown on the video dispelled any concern that Nance was either reaching for an item that could be used to threaten Swisher or the other two officers on the scene, or that he was hiding a weapon so that the officers would be unable to locate it.

## B

Since Nance's firearm was discovered in a search that violated the Fourth Amendment, it is eligible for suppression under the "exclusionary rule." *United States v. Elmore*, 101 F.4th 1210, 1220 (10th Cir. 2024) ("The exclusionary rule is 'the principal judicial remedy to deter Fourth Amendment violations.'") (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). The good faith exception to the exclusionary rule applies when a Fourth Amendment violation is not the result of culpable law enforcement conduct. *See United States v. Loera*, 923 F.3d 907, 925 (10th Cir. 2019); *United States v. Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006).

For a variety of reasons, courts hesitate to apply the exclusionary rule. It is appropriate only when "the deterrence benefits of

---

[6] Nor does it matter that Swisher offered one justification for her frisk when speaking with Nance, then provided additional separate reasons in her post-arrest report. *Contra* Doc. 14 at 5. Her subjective motivations remain irrelevant. *See Guardado*, 699 F.3d at 1224.

suppression … outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 237 (2011). Deterrence benefits "vary with the culpability of the law enforcement conduct at issue." *Id.* at 238 (cleaned up). Law enforcement conduct that is "deliberate," "reckless," or "grossly negligent" makes the "deterrent value of exclusion … strong." *Id.* On the other hand, an "objectively reasonable good-faith belief that [one's] conduct is lawful," or conduct involving only "isolated negligence," makes for a low deterrent value. *Id.* (citations and quotation marks omitted).

The Tenth Circuit has noted that this "good-faith exception is ordinarily limited to situations when the police officer reasonably relied upon the judgment of a neutral third party." *See Herrera*, 444 F.3d at 1249; *United States v. Nelson*, 868 F.3d 885, 892 (10th Cir. 2017) ("[T]he Supreme Court has limited the good-faith exception to circumstances where someone other than a police officer has made the mistaken determination that resulted in the Fourth Amendment violation.") (cleaned up). This limitation works "because the purpose underlying this good-faith exception is to deter police conduct," so the exception "most frequently applies where the mistake was made by someone other than the officer executing the search that violated the Fourth Amendment." *Herrera*, 444 F.3d at 1250; *see also Heien v. North Carolina*, 574 U.S. 54, 57 (2014) ("[A] mistake of law can nonetheless give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment.").

The mistake in Nance's case is attributable to Swisher—not a magistrate (*cf. United States v. Leon*, 468 U.S. 897, 916 (1984)), legislature (*cf. Illinois v. Krull*, 480 U.S. 340, 349 (1987)), department employee (*cf. Arizona v. Evans*, 514 U.S. 1, 14–15 (1995); *Herring v. United States*, 555 U.S. 135, 142 (2009)), or court (*cf. Davis*, 564 U.S. at 232). Since Swisher did not rely on a neutral third party in deciding to search Nance, her conduct is deterrable. *Leon*, 468 U.S. at 91 ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."); 1 LaFave, *Search and Seizure* § 1.3(f) (6th ed.) ("[B]ecause *Leon* rests upon the notion that the exclusionary rule is not implicated where there is no police misconduct to deter, that case does not allow law enforcement authorities to rely on an error of their own making.") (citation and quotation marks omitted).

The Government argues that *Herrera* and its focus on third parties was undermined by *Herring* and *Davis*, Doc. 19, but it was not. *Herrera*'s basic point, that police conduct is deterrable when third parties are not

involved, is fully supported by *Herring* and *Davis*. *Herring* reasoned that "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. at 144. This construction of the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* It followed that an officer who consulted incorrect information in a police database could not be meaningfully deterred. *Id.* at 147–48. *Davis* extended this principle. It refused to apply the exclusionary rule to officers who violated the Fourth Amendment because their "conduct was in strict compliance with then-binding Circuit law and was not culpable in any way." *Davis*, 564 U.S. at 239–40.

*Herring* and *Davis* both involved an officer who relied on someone else's judgment. Of course, both decisions framed the law in terms of culpability. But one consistent thread—as recognized in *Herrera*, and as picked up in Supreme Court cases after *Herrera* was decided—is reliance on a third party. *Leon*, 468 U.S. at 916; *Krull*, 480 U.S. at 349; *Evans*, 514 U.S. at 14–15; *Herring*, 555 U.S. at 142; *Davis*, 564 U.S. at 232. That rule ties all cases mentioned together: an officer probably was not reckless in violating the Constitution if he or she relied on a trusted third party's factual account or court's legal judgment. Without a third party, the officer is responsible for their own decision. They are much more likely to be culpable in an unreasonable mistake or reckless choice, and thus more likely to be deterred by application of the exclusionary rule. *See Davis*, 564 U.S. at 240 ("Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence.") (cleaned up).

This principle persists in Tenth Circuit precedent even after *Herring* and *Davis*. *See, e.g.*, *Loera*, 923 F.3d at 925. True, "very unusual circumstances" could justify "extend[ing] the good-faith exception beyond its pedigree." *Nelson*, 868 F.3d at 892 (cleaned up). But nothing in this case is "very unusual." *See id.* (rejecting an argument that a search "was close enough to the line of validity that an objectively reasonable officer would have acted … the same way") (internal quotation marks omitted). Swisher simply made a mistake by frisking an individual without sufficient cause; that error can be deterred. That compels application

of the exclusionary rule in this case.[7] *See Loera*, 923 F.3d at 925; *Nelson*, 868 F.3d at 892; *see also United States v. Clay*, No. 17-40119, 2018 WL 3872169, at *11 (D. Kan. Aug. 15, 2018) ("This situation does not present one of the four scenarios where the Supreme Court has applied the doctrine, [so] the good faith exception does not apply here.").

### III

For the foregoing reasons, Nance's Motion to Suppress, Doc. 14, is GRANTED.

It is so ordered.

Date: June 26, 2024                    s/ Toby Crouse
                                       Toby Crouse
                                       United States District Judge

---

[7] To the extent that other Circuits have considered this issue, they have reached similar results. *See United States v. Williams*, 731 F.3d 678, 690 (7th Cir. 2013) (refusing to apply the good faith exception where an officer "had little articulable reason to suspect that [the defendant] was armed and dangerous" and "the reasons he did articulate could have been used as pretext to search practically any person who was near the scene on the night of the arrest").